1997 ND 41

Roger E. KLUCK, Plaintiff and Appellee,

v.

Marcia L. KLUCK, Defendant
and Appellant.

Civil No. 960100.

Supreme Court of North Dakota.

March 20, 1997.

Gary H. Lee (argued), of Olson Burns Lee & Larson, Minot, for plaintiff and appellee.

Shirley A. Dvorak (argued), of Moosbrugger, Dvorak & Carter, Grand Forks, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Marcia Kluck appealed a divorce decree placing custody of their two children with Roger Kluck, dividing marital property, and ordering child and spousal support. We affirm in part, reverse in part, and remand for further proceedings.

[¶ 2] Roger and Marcia married in 1982. They have two children: Jennifer, born in 1985, and Jordan, born in 1991. The marriage was turbulent, and the parents separated on several occasions. They testified to frequent incidents of domestic abuse. Marcia characterized Roger as the principal aggressor, while Roger claimed he acted to defend himself and the children from Marcia's violent outbursts.

[¶ 3] Marcia suffers from mental illness, and has been diagnosed with bi-polar disorder, personality disorder, manic depression, and post-traumatic stress syndrome. Marcia has occasionally exhibited violent and suicidal behavior, and has been hospitalized often.

[¶ 4] In December 1994 Roger sued for divorce. The trial court's interim order gave Roger temporary custody of the children and use of the family home. Each parent was restrained from harassing the other. Because Marcia repeatedly filed baseless reports of child abuse against Roger during his temporary custody, the trial court held Marcia in contempt.

[¶ 5] After trial, the court found both parties had committed domestic violence, but

Marcia's had been "significantly greater." The court therefore applied the statutory presumption against placing custody with the perpetrator of domestic violence, *see* NDCC 14–09–06.2(1)(j), and placed custody of the children with Roger. The court authorized supervised visitation with Marcia. The court also divided the marital property, ordered Roger to pay Marcia spousal support of $400 per month, and ordered her to pay him child support of $148 per month. Marcia appealed.

## I. EXPERT TESTIMONY

[¶ 6] Marcia argues that the trial court erred in allowing the testimony of Dr. Jonathan Douglas, who had conducted a custody evaluation ordered under NDCC 14–09–06.3. Marcia contends Dr. Douglas was not qualified to give an expert opinion on child custody.

[¶ 7] Expert testimony is admissible whenever specialized knowledge will assist the trier of fact:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

NDREv 702. Whether a witness is qualified as an expert and whether the testimony will assist the trier of fact are decisions largely within the sound discretion of the trial court. *State v. Trosen*, 547 N.W.2d 735, 739 (N.D. 1996); *Horstmeyer v. Golden Eagle Fireworks*, 534 N.W.2d 835, 837 (N.D.1995). The trial court's decision to admit expert testimony will not be overturned on appeal unless the court has abused its discretion. *Trosen*, 547 N.W.2d at 739; *Horstmeyer*, 534 N.W.2d at 837. As we said in *Anderson v. A.P.I. Co.*, 1997 ND 6, 559 N.W.2d 204, and *State v. Carlson*, 1997 ND 7, 559 N.W.2d 802, Evidence Rule 702 envisions generous allowance of the use of expert testimony if the witness is shown to have some degree of expertise in the relevant field.

[¶ 8] Marcia contends Dr. Douglas was not qualified to conduct the custody eval-

uation because he was not licensed in North Dakota and because his education and training were in adult clinical psychology, not child psychology. Dr. Douglas testified he had a Masters degree and Ph.D. in adult clinical psychology, with "some training as well in the diagnosis and treatment of children." As part of his training, Dr. Douglas did a three-month internship at the Regional Children's Centre in Windsor, Ontario. When he did this custody evaluation, Dr. Douglas was practicing as a clinical psychologist at the North Central Human Service Center under a license exemption that allowed him to practice under the supervision of another doctor until he received his North Dakota license.

[¶ 9] Evidence Rule 702 does not require licensure in a particular field, or licensure in the court's jurisdiction, to qualify as an expert. *Anderson*, 1997 ND 6, 559 N.W.2d 204; *Carlson*, 1997 ND 7, 559 N.W.2d 802; *Oberlander v. Oberlander*, 460 N.W.2d 400, 402 (N.D.1990). Rather, as those opinions explain, it is the witness's actual qualifications that count.

[¶ 10] Nor does Dr. Douglas's lack of more training in child psychology prevent his testimony here. Dr. Douglas has a doctorate in adult clinical psychology, with some training in child psychology. An expert need not be a specialist in a highly particularized field if his knowledge, training, education, and experience will assist the trier of fact. *See, e.g., Anderson*, 1997 ND 6, 559 N.W.2d 204 (specialist in environmental engineering could testify about his perceptions of medical articles he had read to research asbestos-caused illnesses); *In re Estate of Aune*, 478 N.W.2d 561, 563–564 (N.D.1991) (trial court did not abuse its discretion in allowing decedent's physician to testify about insane delusions). An educated and experienced psychologist should be able to qualify as an expert to testify about child custody factors.

[¶ 11] In April 1995, Marcia stipulated the custody evaluation would be done by Dr. Douglas. Dr. Douglas filed his report with the court in June 1995, and counsel for each parent received a copy. Marcia made no objections to the report or to Dr. Douglas's

qualifications until he testified at trial in September 1995. Her sudden objections to his qualifications came too late.

[¶ 12] Marcia also contends that Dr. Douglas was unqualified to give an expert opinion on custody because he was not familiar with the statutory factors affecting the legal determination of custody and because he had a potential conflict of interest and was biased against Marcia. While these aspects may have affected the weight of his opinion, they go to his credibility, not to admissibility of his evidence. *Horstmeyer*, 534 N.W.2d at 837; *Victory Park Apartments, Inc. v. Axelson*, 367 N.W.2d 155, 163 (N.D.1985). We conclude that the trial court did not abuse its discretion in allowing Dr. Douglas to testify as an expert on custody.

## II. CUSTODY

[¶ 13] Marcia contends the trial court erred in finding she had committed significantly greater domestic violence than Roger and in applying the statutory presumption against placing custody with her. We disagree.

[¶ 14] A trial court's custody decision is a finding of fact that we will not reverse on appeal unless it is clearly erroneous. *Ternes v. Ternes*, 555 N.W.2d 355, 357 (N.D.1996); *Kraft v. Kraft*, 554 N.W.2d 657, 659 (N.D.1996). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Ternes*, 555 N.W.2d at 357; *Kraft*, 554 N.W.2d at 659. As *Schmidkunz v. Schmidkunz*, 529 N.W.2d 857, 859 (N.D. 1995), explained, in reviewing findings of fact, we do not retry the case or reassess the credibility of witnesses.

[¶ 15] Domestic violence can be critical for child custody:

> In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent.

NDCC 14–09–06.2(1)(j). We explained the effect of this presumption in *Engh v. Jensen*, 547 N.W.2d 922, 924 (N.D.1996) (citations omitted):

> When credible evidence of domestic violence is presented in a child custody dispute, such evidence "creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child." N.D.Cent.Code § 14–09–06.2(1)(j). We have interpreted the statutory presumption, in essence, to make domestic violence the paramount factor to consider in a custody decision.... The rebuttable presumption outweighs other factors and prevents the abusive parent from obtaining custody of the child, unless, in the case of two fit parents, the violent parent proves "by clear and convincing evidence that the best interests of the child require" that the perpetrator receive custody.

[¶ 16] In this case, there was evidence that both Marcia and Roger engaged in domestic violence. Under these circumstances, the trial court had to consider the proportionality of each parent's violent conduct:

> [A] proper construction of the statute requires that if domestic violence has been committed by both parents, the trial court measure the amount and extent of domestic violence inflicted by both parents. If the amount and extent of domestic violence inflicted by one parent is significantly greater than that inflicted by the other, the statutory presumption against awarding custody to the perpetrator will apply only to the parent who has inflicted the greater domestic violence, and will not apply to the parent who has inflicted the lesser. However, if the trial court finds that the amount and extent of the violence inflicted by one parent is roughly proportional to the violence inflicted by the other parent, and both parents are otherwise

found to be fit parents, the presumption against awarding custody to either perpetrating parent ceases to exist. In such a case, the trial court is not bound by any presumption, but may consider the remaining customary best-interests factors in making its custody decision.

*Krank v. Krank,* 529 N.W.2d 844, 850 (N.D. 1995) (footnote omitted); *see also Kraft,* 554 N.W.2d at 662; *Engh,* 547 N.W.2d at 924–925; *Owan v. Owan,* 541 N.W.2d 719, 722 (N.D.1996); *Helbling v. Helbling,* 532 N.W.2d 650, 653 (N.D.1995). Following the directives of the cases and the statute, the trial court here found that, although each parent had committed domestic violence, Marcia's violent conduct was "significantly greater" than Roger's.

[¶ 17] There is ample evidence for that finding. Most of each parent's testimony about domestic violence focused on the same incidents, but they differed on who was the aggressor. Marcia's version described Roger as the aggressor when he would hit her, choke her, and throw her to the ground or against a wall. Roger testified Marcia would fly into uncontrollable rages on these occasions, and he would have to defend himself and the children by grabbing her and holding her down.

[¶ 18] Faced with this conflicting testimony on the nature of the violence, the trial court had to assess the credibility of the witnesses and resolve the factual disputes. *See Schmidkunz,* 529 N.W.2d at 859. The court saw Roger as more credible, and specifically found Marcia was not credible.

[¶ 19] There are two specific incidents that stand out as evidence of Marcia's greater violence. On one occasion she discharged a fire extinguisher in Roger's face, and another time she pointed a loaded gun at Roger and threatened him. These instances of escalated violence support the trial court's finding that Marcia's violent conduct was significantly greater than Roger's, and we will not retry the case or reassess credibility.

[¶ 20] We conclude the trial court's finding that Marcia committed significantly greater domestic violence is not clearly erroneous. Accordingly, the trial court correctly applied the presumption against placing custody with Marcia.

## III. VISITATION

[¶ 21] Marcia contends the trial court erred in allowing her only supervised visitation with the children. NDCC 14–05–22(3) governs visitation by a parent who has been violent:

> If the court finds that a parent has perpetrated domestic violence and that parent does not have custody, the court shall allow only supervised child visitation with that parent unless there is a showing by clear and convincing evidence that unsupervised visitation would not endanger the child's physical or emotional health.

We have upheld the trial court's finding that Marcia has engaged in greater violence, and this parallel statute on violence affecting visitation therefore applies.

[¶ 22] The trial court found Marcia's conduct risked the children's welfare:

### IX.

Marcia is a risk to the children's safety, and to their emotional well being. She cannot, therefore, have them in her control under her present condition.

### X.

Expert testimony, which has been accepted by the Court, has deemed Marcia to be emotionally harmful to the children.

### XI.

Marcia's impulsiveness and her exercise of poor judgment could place the children at risk.

Marcia challenges these findings, asserting "[t]here was no reasonably certain expert testimony that Marcia was emotionally harmful to the children." Marcia's argument, however, ignores the heavy burden of proof imposed on her by NDCC 14–05–22(3). The statute effectively creates a presumption that unsupervised visitation would be harmful to the child's physical or emotional health, and it allows unsupervised visitation only if the offending parent proves by clear and con-

vincing evidence that it will not be harmful to the child. No burden is imposed on the custodial parent to prove, by expert testimony or otherwise, that unsupervised visitation with the more violent parent will in fact be harmful to the child.

[¶ 23] The trial court went further than the statute directs, finding, in addition to the presumption, that Marcia posed a significant risk to the emotional health of the children. This record supports that finding. In addition to evidence of Marcia's violence directed at Roger and the children while the family lived together, evidence about several occasions while the divorce was pending showed that Marcia's conduct adversely affected the children. Once, Marcia confronted Roger and the children in front of Jennifer's school and attempted to drag Jennifer into a taxicab. At the time, Marcia was under court order not to have unsupervised contact with the children. Another time, Marcia had to be removed from the YMCA when she interrupted Jordan's swimming class. Marcia repeatedly filed baseless child abuse charges against Roger that caused significant emotional impact upon the children when they were called out of class at school and strip-searched for evidence of abuse. Marcia's conduct during the marriage and the pending divorce demonstrated an acute lack of insight into the effect of her conduct upon the children, and created a strong basis for concern about the children's physical and emotional health if unsupervised visitation was presently permitted.

[¶ 24] The trial court's decision on visitation is a finding of fact that will not be reversed on appeal unless it is clearly erroneous. *Smith v. Smith*, 534 N.W.2d 6, 12 (N.D.1995). Marcia has failed to submit clear and convincing evidence that unsupervised visitation would not endanger the physical or emotional health of the children. Therefore, the trial court's finding that supervised visitation is currently needed is not clearly erroneous.

## IV. PROPERTY DIVISION

[¶ 25] Marcia challenges the trial court's division of the marital property. In a divorce case, the trial court must equitably distribute the marital property. NDCC 14–05–24; *Grinaker v. Grinaker*, 553 N.W.2d 204, 207 (N.D.1996); *Gronland v. Gronland*, 527 N.W.2d 250, 252 (N.D.1995). The court's decisions on valuation and division of property are findings of fact that will only be reversed on appeal if they are clearly erroneous. *Grinaker*, 553 N.W.2d at 208; *Linrud v. Linrud*, 552 N.W.2d 342, 345 (N.D.1996). As the latter opinion explains at 345, in reviewing the division of property, we start with the view that marital property should be equally divided and, while the division need not be exactly equal to be equitable, the trial court must explain any substantial disparity.

[¶ 26] The trial court calculated the property distribution between the Klucks like this:

| Marcia | |
|---|---|
| Property | $ 18,149.00 |
| Debts | 6,998.00 |
| Net Distribution | $ 11,151.00 |

| Roger | |
|---|---|
| Property | $130,455.00 |
| Debts | 133,093.00 |
| Net Distribution | $ − 2,638.00 |

Marcia contends the trial court erred by including certain assets and debts in the marital division, erred in not valuing Roger's ownership share in a professional engineering corporation, and made an inequitable distribution of property. We agree.

### A. WORKERS COMPENSATION "DEBT"

[¶ 27] The trial court allocated as a debt for Roger to pay an amount of $20,-971.00 "owed" to the Workers Compensation Bureau. Roger injured his back in a 1991 automobile accident on a business trip. After applying for workers compensation benefits, Roger settled his personal injury claim against a negligent third party for $43,000. The Workers Compensation Bureau suspended any future benefits for Roger from the accident until he incurred additional covered losses of $20,971.00. *See* NDCC 65–01–09; *Jones v. Pringle & Herigstad, P.C.*, 546 N.W.2d 837, 840–841 (N.D.1996); *Blaskowski v. North Dakota Workmen's Compensation Bureau*, 380 N.W.2d 333, 335–336 (N.D.

1986). The trial court treated the suspension of future benefits to Roger as his "debt."

[¶ 28] Where receipt of future benefits is speculative, we have held the potential benefits should not be valued as assets in the marital estate. *Heggen v. Heggen,* 452 N.W.2d 96, 101 (N.D.1990) (future drought assistance payments); *Fries v. Fries,* 288 N.W.2d 77, 81 (N.D.1980) (pending personal injury claim); *compare van Oosting v. van Oosting,* 521 N.W.2d 93, 97–98 (N.D.1994) (although husband's interest in estate-planning trust was subject to contingencies, that vested property interest should be divided between spouses by percentage of future payments when made). Roger's potential responsibility for future medical expenses or disability here is speculative. Roger testified the suspension of workers compensation benefits to him was a "contingent liability." By law, however, "[t]he Bureau recovers the suspended benefit amount only if and when the claimant incurs future expenses equaling the amount of benefits suspended." *Jones,* 546 N.W.2d at 841; *see also Blaskowski,* 380 N.W.2d at 336. Although Roger testified he may require back surgery at some future date, there was no medical evidence of the likelihood or projected cost of that surgery. Nor was there evidence that Roger, rather than his medical insurer, would actually bear the cost of that surgery. On this record, any obligation imputed from the suspension of his benefits would have been speculative.

[¶ 29] Roger cites no cases where we have held that speculative future liabilities of a party could be allocated as a presently defined obligation. The potential of future responsibility for costs of uncertain changes in someone's health that are foreshadowed by suspension of a specific amount of future benefits does not create a present marital debt. We conclude the trial court erred by including this $20,971.00 item as "debt" for allocating the marital estate.

## B. SOCIAL SECURITY BENEFITS

[¶ 30] The trial court included among the marital assets, and credited Marcia for part of her share of the marital property, a $10,659.00 lump-sum social security disability payment Marcia received in 1995 and soon spent. Marcia contends counting this amount as marital property violated the anti-alienation section of the Social Security Act:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

42 U.S.C. 407(a). In *Olson v. Olson,* 445 N.W.2d 1, 5–11 (N.D.1989), we extensively addressed the effect of this federal law on the property division in a divorce case:

> Although marital property is generally under state control, it is clear to us that Congress wants social security to be exclusively federally controlled. Congress preempted state divorce laws when it enacted its own scheme of social security benefits for divorced spouses. The anti-assignment and anti-legal-process provisions in the Social Security Act, with their specific allowance for spousal support, also promote federal uniformity and preempt state law.

> We conclude that social security cannot be distributed or used as an offset in division of marital property. To do so would conflict with the federal plan and would violate the Supremacy Clause of the United States Constitution. Any change in the allocation of social security at divorce must come from Congress. Therefore, we affirm the trial court's ruling that "[s]ocial security benefits of either party shall not be considered in this matter."

*Olson,* 445 N.W.2d at 11 (footnote omitted). *Compare Vitko v. Vitko,* 524 N.W.2d 102, 104 (N.D.1994) (trial court did not err in excluding military disability benefits and social security benefits from the equitable property division, while considering the disability income "so as to determine the financial circumstances of each party to ·the divorce"). We thus concluded in *Olson* that federal law prohibits counting social security benefits as marital property.

[¶ 31] Roger asserts *Olson* should be distinguished because it dealt with future benefits, while here the trial court held that benefits already received by Marcia were marital property. Roger argues:

> As the Court in *Olson* pointed out, it is the future expectancy of receiving Social Security which cannot be transferred, assigned, or attached. It is the future benefits of Social Security which cannot be considered.

> However, once a benefit is received in the form of cash it is no longer a future benefit. As cash money it is no different than any other money which might be in the bank as a savings or checking account. Having received the lump sum distribution the payment was transformed into an asset which the Court could properly consider for the division of property.

However, 42 U.S.C. 407(a) expressly shelters "moneys paid or payable" for the recipient alone. Any doubt about this was resolved by the United States Supreme Court in *Philpott v. Essex County Welfare Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). In *Philpott*, a county welfare board sought reimbursement from a welfare recipient and attempted to reach a lump-sum social security disability payment that the welfare recipient had received and held in a bank account. The Supreme Court concluded 42 U.S.C. 407(a) barred reaching the funds in the account:

> On its face, the Social Security Act in § 407 bars the State of New Jersey from reaching the federal disability payments paid to Wilkes. The language is all-inclusive: "[N]one of the moneys paid or payable ... under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process...." The moneys paid as retroactive benefits were "moneys paid ... under this subchapter"; and the suit brought was an attempt to subject the money to "levy, attachment ... or other legal process."

*Philpott*, 409 U.S. at 415–416, 93 S.Ct. at 592 (footnote omitted). The Court explained that "[t]he protection afforded by § 407 is to 'moneys paid,'" and "the funds on deposit were readily withdrawable and retained the quality of 'moneys' within the purview of § 407." *Philpott*, 409 U.S. at 416, 93 S.Ct. at 592. The Court concluded that § 407 "imposes a broad bar against the use of any legal process to reach all social security benefits." *Philpott*, 409 U.S. at 417, 93 S.Ct. at 592; *see also Bennett v. Arkansas*, 485 U.S. 395, 397–398, 108 S.Ct. 1204, 1205–1206, 99 L.Ed.2d 455 (1988). Thus, identifiable social security moneys in the hands of a divorcing spouse cannot be counted as marital assets to calculate divisions.

[¶ 32] Many other courts have agreed, concluding that 42 U.S.C. 407(a) protects identifiable social security benefits previously paid, as well as future benefits. *See*, as examples, *Guidry v. Sheet Metal Workers National Pension Fund*, 39 F.3d 1078, 1083 (10th Cir. 1994); *In re Marriage of Knipp*, 15 Kan. App.2d 494, 809 P.2d 562, 563–564 (1991); *Hatfield v. Cristopher*, 841 S.W.2d 761, 767 (Mo.Ct.App.1992); *Boulter v. Boulter*, 930 P.2d 112, 115 (Nev.1997). The trial court's findings that Marcia's social security funds were marital property and that those funds must be counted for Marcia as part of the marital estate were induced by an erroneous view of the law and are clearly erroneous.

## C. ROGER'S SHARE OF WOLD ENGINEERING

[¶ 33] Marcia challenges the trial court's finding that Roger's shares in the professional corporation he worked for, Wold Engineering, P.C. [Wold], had no value. Roger is a civil engineer and owns ten percent of the outstanding shares in Wold. The Wold firm had offices in three cities and gross revenue of $1.1 million annually. The trial court, relying upon a financial statement prepared by Wold's accountants, found Wold had "minimal, if any, net value on the market."

[¶ 34] Marcia argues the financial report, entitled "Statement of Assets, Liabilities and Stockholders' Deficit—Income Tax Basis," did not accurately reflect the value of the corporation and did not support the trial court's decision not to value Roger's ten percent ownership. The financial statement, purporting that Wold's liabilities exceeded its assets, showed substantial depreciation of Wold's property and equipment. The state-

ment valued property and equipment at $491,871.03, less depreciation of $439,263.27, for a net book value of only $52,607.76.

[¶ 35] We have upheld a trial court's refusal to accept a financial statement valuing assets at depreciated cost, where the trial court concluded the valuation was "strictly an accounting valuation" that had "very little relationship to the true value of the physical assets." *Fraase v. Fraase*, 315 N.W.2d 271, 275 (N.D.1982). In this case, the evidence clearly shows the depreciated values in the financial statement did not reflect the actual market value of those current assets. Don Indvik, Wold's president, testified those figures included property the company no longer owned, and that the figures were merely "accounting practices." He further testified the property and equipment, figured at $52,607.76 in the financial statement, could actually be sold for $125,000 to $150,000. Indvik's description of the assets, including office furniture, equipment, and computers for three separate branch offices, surveying and field equipment, and twelve company-owned vehicles, supported his opinion of a higher salable value.

[¶ 36] A further problem with the financial statement is that, in valuing a professional corporation, the trial court must include "at a *minimum* the interest in the office equipment, furniture, fixtures, and the accounts receivable." *Bard v. Bard*, 380 N.W.2d 342, 344 (N.D.1986); *see also Fraase*, 315 N.W.2d at 275. Accounts receivable include finished as well as unfinished business. *Fraase*, 315 N.W.2d at 275. This financial report inexplicably failed to show any accounts receivable. We consider it inconceivable that an ongoing professional firm generating more than a million dollars in annual revenues would not, at any given time, have significant accounts receivable for completed work and work in progress.

[¶ 37] Marcia also contends Roger had been contractually guaranteed a significant buy-out amount if he ever left Wold, further evidencing his shares have a value greater than zero. Don Indvik testified Wold's corporate by-laws directed, if a shareholder left the firm, that person was entitled to the equivalent of one year's current salary

as a minimum payment for surrender of his shares. At the time of trial, Roger's annual salary was near $46,000. The trial court did not satisfactorily explain why it disregarded this evidence of the value of Roger's shares nor why it concluded the shares had no value.

[¶ 38] The members of a professional firm may set the value of a partner's interest by contract. *See Fraase*, 315 N.W.2d at 275. Roger argues, however, under our holding in *Sanford v. Sanford*, 301 N.W.2d 118 (N.D. 1980), a corporate buy-out agreement does not evidence the value of a shareholder's ownership. *Sanford* is distinguishable. In that case, the value of Reed Sanford's interest in his professional corporation was disputed. An employment agreement with a second orthodontist in the practice included a complex buy-out formula in the event Sanford died or became disabled. We upheld the trial court's conclusion that the buy-out formula did not represent the actual current value of Sanford's interest because it reckoned amounts for pre-billed orthodontic services that were contingent on Sanford performing later work and because it was too speculative.

[¶ 39] There are no such contingencies or speculative amounts in the Wold buy-out agreement. Indvik did not say Wold's buy-out arrangement was limited to death or disability of the shareholder, and the value did not include speculative amounts for future work. Rather, this buy-out agreement equals an open offer to buy back Roger's shares at a minimum value of one year's current salary.

[¶ 40] Because the trial court's valuation of Roger's share of Wold was based upon a financial report that did not reflect a true market value of the company's assets and failed to include any amount for accounts receivable, and because the trial court did not satisfactorily explain why it ignored evidence of a buy-out agreement that guaranteed Roger $46,000 for his ownership share at the time of trial, we have a definite and firm conviction that a mistake has been made. Accordingly, we conclude the trial

court's finding that Roger's interest in Wold had no value was clearly erroneous.

## V. CONCLUSION

[¶ 41] The trial court's errors in valuation and division of property significantly affect the equities of the property distribution. Accordingly, we remand for redetermination of the property distribution.

[¶ 42] Our remand for a redetermination of property distribution may affect and necessitate changes in the other financial features of the divorce decree. *See*, for example, *Pankow v. Pankow*, 347 N.W.2d 566, 569 (N.D. 1984). Accordingly, on remand, the trial court should also reconsider child support,[1] spousal support, transportation costs for visitation, and attorneys fees in light of changes made in the property distribution.

[¶ 43] The property distribution is reversed, all financial aspects of the decree are remanded for reconsideration, and the decree is otherwise affirmed.

[¶ 44] VANDE WALLE, C.J., and MARING, NEUMANN, and SANDSTROM, JJ., concur.

---

1. Today's child support guidelines would often alleviate any concern that child support may be affected by changes in the property distribution. Before adoption of the guidelines, child support was based in part upon the ability of the non-custodial parent to pay. *See, e.g., Montgomery v. Montgomery*, 481 N.W.2d 234, 235–236 (N.D. 1992); *Heggen v. Heggen*, 452 N.W.2d 96, 102 (N.D.1990). Included in that assessment, in addition to the parent's income, was the parent's net worth and physical assets. *Illies v. Illies*, 462 N.W.2d 878, 881 (N.D.1990). Then, as *Pankow*, 347 N.W.2d at 569, illustrated, changes in property distribution could affect a parent's ability to pay, warranting reconsideration of a child support order if there were significant changes in the property division.

Under today's guidelines, child support is generally calculated solely upon the non-custodial parent's income, without separately taking into consideration the extent of a parent's assets beyond current earnings. *See* NDAC 75–02–04.1– 10; *In re K.G.*, 551 N.W.2d 554, 556 (N.D.1996) ("the guidelines already contemplate a parent's financial ability to pay"). Unless a change in property distribution might significantly affect the non-custodial parent's income, any change in property division will not affect child support. Here, however, the child support ordered is based upon Marcia's income, including spousal support from Roger. Thus, because any change in the property distribution may change spousal support, and the resultant change in spousal support will also affect the amount of child support Marcia must pay, we authorize reconsideration of child support on remand, too.