2003 ND 132

**Duane E. LANGNESS, Plaintiff and Appellant,**

v.

**FENCIL URETHANE SYSTEMS, INC., a corporation, Defendant and Appellee,**

**RDO FARM PARTNERSHIP, d/b/a RD Offutt, Inc., a corporation; James Behrens; and Polydyne, Inc., Defendants.**

No. 20030004.

Supreme Court of North Dakota.

Aug. 20, 2003.

Duane A. Lillehaug (argued), Leland F. Hagen (on brief), and Robert M. Light (on brief), Lee Hagen Law Office, Fargo, N.D., for plaintiff and appellant.

Randall J. Bakke (argued) and Shawn A. Grinolds (on brief), Smith Bakke Oppegard Porsborg Wolf, Bismarck, N.D., for defendant and appellee.

MARING, Justice.

[¶1]  Duane Langness appealed from a judgment entered upon a jury verdict dismissing his action against Fencil Urethane Systems, Inc. for negligent application of epoxy primer and exposure to toxic chemicals.  We hold the trial court abused its discretion in excluding the proffered testimony of Langness' expert, Dr. Alan Buck.  We reverse and remand for further proceedings.

I

[¶2]  In 1997, Langness sold RDO Farms a 70 by 186 foot steel-arched quonset for use as a potato warehouse near Mandan.  Langness assisted RDO Farms in the construction of the building, includ-

ing an air-exchange system. RDO Farms hired Fencil, a Wisconsin corporation owned by Darrell Fencil and his wife, to apply an epoxy primer and to spray urethane foam insulation in the interior of the warehouse. The epoxy primer was manufactured by Polydyne, Inc., and contained methyl ethyl ketone ("MEK"). The epoxy primer was in fifty-five gallon barrels with a label that cautioned not to breathe vapor or spray mist of the primer and to wear approved respirators. The label also cautioned to use the primer only in a ventilated area. A material safety data sheet ("MSDS") for the epoxy primer stated "[s]hort-term inhalation toxicity is low. Breathing small amounts during normal handling is not likely to cause harmful effects. Breathing large amounts may be harmful. Symptoms are more likely seen at air concentrations exceeding the recommended exposure limits." The MSDS for the epoxy primer also indicated "[v]apors are heavier than air and may travel along the ground or may be moved by ventilation."

[¶ 3] On September 11, 1997, Fencil began applying the epoxy primer while Langness and other workers were finishing work on the east end of the building, where the only openings to the building were located. Fencil arrived at the building site at about one p.m. and set up his equipment to begin spraying the epoxy primer in the interior of the west end of the building, placing a pump in the middle of the building and a scissors lift in the west end of the building. Fencil covered the scissors lift with polyethylene wrap and put on protective clothing, including a hood and mask with an outside air supply.

[¶ 4] According to Langness, he and several other people were working inside the east end of the building, and Fencil agreed not to start spraying until the workers were finished, which Langness

told Fencil would be about two hours. According to Langness, he was working inside the building on scaffolding when he and the other workers began smelling the epoxy primer and were enveloped in a blue fog, and he asked Fencil to stop spraying. According to Donald Black, one of the other workers in the building, Fencil sprayed for a "good half hour" before Langness asked Fencil to stop. Black testified the building was full of fog and visibility was about forty feet. According to Langness, Fencil agreed to stop spraying until the workers were done, but Fencil subsequently began spraying a second time while Langness and other workers were working inside the building and a blue fog again enveloped the workers. Gary Cox, another worker in the building, testified that he saw Fencil switch the sprayer from one fifty-five gallon barrel of primer to another fifty-five gallon barrel. According to Langness, he became ill from the exposure to the spray, gathered his equipment, left the building site, and returned about a week later to complete his work. According to Cox and Langness, some of the workers had immediate reactions to the primer and were coughing and throwing up.

[¶ 5] Fencil testified he did not remember any people working inside the building when he arrived at the site. According to Fencil, he initially warned the workers he was going to start spraying in the west end of the building and no one objected. One of Fencil's employees testified all the workers were offered a protective mask to wear while the building was being sprayed, but none of them accepted the offer. Fencil testified he began spraying in the west end of the building, about 180 feet from Langness' work area, and he stopped spraying on both occasions when Langness asked him to stop. According to Fencil, he sprayed for about five minutes on each occasion at a rate of one-half gallon per

minute and only sprayed about two and one half gallons of primer each time he sprayed.

[¶ 6] Langness claims Fencil negligently applied the epoxy primer inside the building and exposed him to toxic chemicals. Langness alleges he suffers from Reactive Airways Dysfunction Systems ("RADS"). Langness sued Polydyne for strict liability in tort and negligence, and Fencil, RDO, and an RDO employee for negligence. Before trial, Langness settled with all the defendants except Fencil. A jury returned a special verdict finding Fencil was not negligent. Langness appealed.

## II

[¶ 7] Langness argues the trial court erred in excluding the proffered testimony of his expert, Dr. Alan Buck.

[¶ 8] Rule 702, N.D.R.Ev., provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, N.D.R.Ev., "envisions generous allowance of the use of expert testimony if [proffered] witnesses are shown to have some degree of expertise in the field in which they are to testify." *Anderson v. A.P.I. Co.*, 1997 ND 6, ¶ 9, 559 N.W.2d 204. A witness must be qualified as an expert before testifying, by opinion, as to scientific, technical or other specialized knowledge. *Estate of Aune*, 478 N.W.2d 561, 564 (N.D.1991). A witness need not have a formal title or be licensed in any particular field to qualify as an expert, and the witness's actual qualifications may be established by knowledge, skill, experience, training, or education. *Oberlander v. Oberlander*, 460 N.W.2d 400,

402 (N.D.1990). Experts need not be a specialist in a highly particularized field if their knowledge, training, education, and experience will assist the trier of fact. *Kluck v. Kluck*, 1997 ND 41, ¶ 10, 561 N.W.2d 263.

[¶ 9] The trial court must ascertain whether proffered expert testimony is reliable and relevant. *Hamilton v. Oppen*, 2002 ND 185, ¶ 15, 653 N.W.2d 678. Whether a witness is qualified as an expert is a discretionary decision for the trial court. *Myer v. Rygg*, 2001 ND 123, ¶ 8, 630 N.W.2d 62. The trial court's decision that a witness is, or is not, qualified as an expert will not be reversed on appeal absent an abuse of discretion. *Id.* A trial court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, if its decision is not the product of a rational mental process leading to a reasoned determination, or if it misinterprets or misapplies the law. *Id.* In *Myer*, at ¶ 15, we discussed several cases describing a trial court's discretion within the context of the generous allowance of the use of expert testimony to assist the trier of fact:

a trial court does not abuse its discretion by admitting expert testimony whenever specialized knowledge will assist the trier of fact, even if the expert does not possess a particular expertise or specific certification. *Botnen v. Lukens*, 1998 ND 224, ¶ 13, 587 N.W.2d 141 (holding trial court did not abuse its discretion by permitting a psychologist to testify with regard to generalities despite the fact the expert had not interviewed or evaluated the child or any party to the litigation); *Anderson*, 1997 ND 6, ¶ 18, 559 N.W.2d 204 (deciding specialist in environmental engineering could testify about his perceptions of medical articles he had read to research asbestos-caused illnesses); *Kluck*, 1997 ND 41, ¶ 10, 561 N.W.2d 263 (agreeing an educated and

experienced psychologist could be qualified as an expert to testify about child custody factors); *Endresen [v. Beretta USA Corp.]*, 1997 ND 38, ¶ 14, 560 N.W.2d 225 (holding the trial court did not abuse its discretion in admitting expert's testimony, treating the expert's lack of direct experience with specific feeding and gas venting system design of semi-automatic weapons as bearing on the weight of his testimony); *Horstmeyer v. Golden Eagle Fireworks*, 534 N.W.2d 835, 837 (N.D.1995) (holding the trial court did not abuse its discretion by admitting expert who did not have a specialized scientific education in fireworks, but demonstrated extensive knowledge, skill, and experience from his 35 years in the fireworks industry); *Wanner v. Getter Trucking, Inc.*, 466 N.W.2d 833, 837 (N.D.1991) (holding the trial court did not abuse its discretion by admitting testimony of expert who, although not familiar with the rigging procedure for a traveling block assembly of an oil rig prior to the case, after studying the information was able to form the opinion that the trucking company did not use the safest available method); *Estate of Aune*, 478 N.W.2d 561, 563–64 (N.D.1991) (holding trial court did not abuse its discretion in allowing decedent's physician, who was not a psychiatrist, to testify about insane delusions); *Oberlander*, 460 N.W.2d 400, 402 (N.D. 1990) (holding trial court's per se disqualification of an expert witness based on the lack of a North Dakota psychologist license was an abuse of discretion because "to qualify as an expert, a witness need not be licensed in a given field, let alone licensed in the court's jurisdiction, so long as the witness possesses the requisite knowledge, skill, experience, training, or education in that field"); *Victory Park Apartments, Inc. v. Axelson*, 367 N.W.2d 155, 163 (N.D. 1985) (holding the trial court did not abuse its discretion by allowing fire chief to testify in his opinion the fire was caused by a cigarette).

[¶ 10]  Here, in response to Fencil's discovery request, Langness identified Dr. Buck as an expert in "[t]oxicology, chemistry, biochemistry and physiology plus the general sciences of environmental toxicology and environmental sciences" who "will testify primarily as a toxicologist, but his expertise in chemistry, biochemistry, physical-chemistry will be used to substantiate his opinions." Langness indicated Dr. Buck would testify about "[t]he concentrations of toxic materials released by the defendant, Fencil, during the spraying episodes"; "OSHA Permissive Exposure Limits ("PEL") established for the toxic materials released by defendant Fencil"; "[m]edical syndromes manifested by those persons exposed to the toxic materials released by defendant Fencil [and c]onsequences of exposures to less than the PEL, equal to the PEL and greater than the PEL or the IDLH (Immediately Dangerous to Life and Health)"; "[c]hronic and acute symptoms manifested by persons exposed to the above three levels or concentrations of toxic materials"; and "[p]rognosis of persons exposed to the above three levels or concentrations of toxic materials."

[¶ 11]  At trial, Langness made an offer of proof about Dr. Buck's proffered testimony:

First, we would ask him to assume that the spray that was being applied at the rate of—was being applied at the rate of three gallons per minute in accordance with the specifications for the sprayer. Full capacity, so that one full 55–gallon drum would be applied in 18 minutes, or thereabouts. We'd ask him to assume that the wind was out of the southeast, or at 150 degrees and range

from 20 to 30 miles per hour during the afternoon of September 11. That the temperature reached as high as 79 degrees and was still at 73 degrees by 6:00 p.m. That the openings cut in the west [sic] end for doors and louver as depicted in the various photographs were all open. That Mr. Langness was working at the height 20 feet at the east end of the plenum wall. Vaporized MEK and blue fog became so thick when Mr. Langness began to climb down that he could barely see his co-worker near him or—and, excuse me, and could not see much of his hand held out in front of his face.

We would ask him to assume, further, that all of the six or seven workers in the building felt respiratory irritation from the fumes, they felt dizziness, nauseous and similar circumstances by at least the point where they began to leave the building, which they did as fast as they could under the circumstances.

Further, that once outside some or all of the workers were throwing up and had what are known as the dry heaves, that some or all were coughing hard and repeatedly[,] that some or all, including Mr. Langness, were bringing up the blue-colored particles from their lungs when coughing.

Further, that when the sprayer came out from the rear of the building, he was not visible to the people outside until he was within 20 to 50 feet or so of the door because of the blue fog. That all work stopped, and the people all left the building for about one hour after the spraying was brought to a halt.

Next, we would ask him to assume that Duane [Langness] and the other construction workers re-entered the building about one hour later and resumed their work.

Next, that about 45 minutes later the spraying resumed and at the same spray rate, and with the same results as the first time regarding the thickness of the evaporated MEK and the particles it carried and the effect on the workers. Next, that in addition to coming down from the scaffolding and the wooden platform were [sic] Mr. Langness was at, the workers, including Mr. Langness, spent additional time in the building removing scaffolding, saws, tools, hoses and related equipment because they observed the blue paint particles were coating that equipment.

That Mr. Langness experienced all of these health problems described by him in the deposition and described in the medical records. That the total exposure time to the MEK particles of Duane [Langness] was as high as 45 minutes to an hour and no less than 10 to 15 minutes.

And then we would ask that based on those assumptions and the other information he has, including the inspection of the building, the statements given by the coworkers, including Mr. Cox and other coworkers and supplied to Dr. Buck, and the information in the depositions and documents received in discovery, we would ask his opinions regarding the following: And the first question would be, did the epoxy primer reach the level of the STEL [short term exposure limit] of 300 parts per million at the place where Mr. Langness was at the east end of the building? Our offer of proof would indicate that Dr. Buck would testify that it definitely did, and actually would have reached significantly higher, and that even at the rate of one gallon per minute, the STEL was reached within three minutes at the point where the sprayer was. He would spray—that the spray would tend to sink to the floor, but it would build in

layers and would tumble and roll in the building as it filled the interior, all tending to flow towards the east where the only openings were located.

He would testify the fog would enter the plenum through all of the 22 two-foot openings at the base of the plenum wall and would flow to the east as though in a chimney, thereby rapidly building up to at least as high a concentration there as it was where the sprayer was, and likely even greater because of the openings directly to the east where Mr. Langness was.

So his opinion would be that he definitely was exposed to the SDH limit of 15 minutes, and considerably more on both occasions of the spraying.

We would then ask his opinion as to whether the epoxy primer reached the level of the IDLH 3,000 parts per million, which Dr. Buck would testify to mean that at such levels one would expect that 50 percent of the people exposed at that level would die within 15 minutes. And we would ask him to state whether it was his opinion one way or another whether Mr. Langness, being at the east end of the building would have experienced that level at any time for any period of time of the IDLH, and Dr. Buck, we expect, would testify that at three gallons per minute, the IDLH was reached where the sprayer was within 18 minutes, and the spray would have filled the building at that level, at least by the time Duane [Langness] stated he could barely see his co-worker. And his opinion would be that considering the flow of gases and normal condition considering the building particularly from the point of view that it can only leave the building at the east end, not to any other directions, that the IDLH would have been reached where Mr. Langness and all of the workers were. And his opinion would be that that oc-

curred on both the first spraying and the second.

Then we would ask him whether irrespective of the SDEL or IDLH limits and the time of exposure, whether he had an opinion as to whether Mr. Langness and the other workers became exposed to the chemical to a point in which they could have sustained physical damage, and his opinion we would expect would be that, yes, by the fact that they were bringing up these particles from their lungs, inhaled along with the spray, that Mr. Langness and the other workers, based solely on that evidence, would have inhaled enough of the spray of the level to have been likely to have experienced injury.

[¶ 12] The trial judge originally assigned to the case granted Fencil's motion in limine to exclude Dr. Buck's testimony. However, that judge was recused, and the case was assigned to a second judge, who issued his own ruling on the motion in limine. Because the second judge issued his own decision on the motion in limine, we review that judge's ruling.

[¶ 13] The second judge granted Fencil's motion in limine to exclude Dr. Buck's testimony, concluding:

The record indicates that Dr. Buck has previously given considerable expert testimony, and that he has degrees in chemistry, biochemistry, and a Ph.D. in environmental physiology.

The record before the Court on this motion includes portions of Dr. Buck's deposition. He acknowledged that his testimony would involve making certain assumptions and would, in essence, be theoretical, or speculative. It would appear that foundation would be lacking for some of the opinions he would intend to offer, i.e. his acknowledgment that he did not have a clear picture regarding

the amount of toxic material that had actually been sprayed by the defendant in the Quonset on the day in question. Further, the fact that he has limited educational credentials in the toxicology field and would be intending to offer testimony regarding the effects of the alleged toxins on the plaintiff's body, the Court feels that area is more appropriately addressed by [Langness' treating physician and] medical expert, ... Dr. [Blair] Anderson.

[¶ 14] Langness alleged Fencil negligently sprayed the epoxy primer in the interior of the building while Langness was working inside the building and Fencil's negligence exposed him to serious injury. One issue regarding Fencil's alleged negligence was the amount of epoxy primer dispensed into the quonset by Fencil during the two spraying incidents and the concentration of toxic materials. Dr. Buck's educational background included degrees in chemistry and biochemistry and a Ph.D. in environmental physiology. His employment history included work with hazardous material disposal sites and transport systems and safety protocols for clean-up and closure of hazardous material sites. Dr. Buck had been a manager of environmental affairs for Gulf Interstate Engineering, where he supervised environmental and regulatory matters. Dr. Buck also worked at NASA and wrote scientific articles dealing with toxins in spacecraft cabins. Dr. Buck had taken graduate credit courses in toxicology and graduate seminar courses in gas dynamics and atmospherics. He taught environmental medicine, pulmonics, anatomy, and physiology courses to graduate and medical students. Dr. Buck had been a project manager for several studies, including "[d]ispersion of [m]ethane in supersaturated fog (white-out) conditions", "[d]ispersion/dissipation of ketone fumes in a factory; seasonal variation", "[c]limatological

model of solvent dispersion from a factory", "[v]entilator plumes containing solvents, particulates and heavy metal fumes", "[d]ispersion of Diazo printer fumes in a poorly ventilated building', and "[h]uman pulmonics in orbital spacecraft." Dr. Buck also had completed more than thirty audits for "toxic/hazardous materials." Although Dr. Buck did not have a degree in toxicology, he had experience and training in chemistry, biochemistry, and physical chemistry with specialized knowledge which could have assisted the trier of fact to understand the amount and concentrations of toxic materials released by Fencil during the spraying incidents. To the extent the trial court concluded that Dr. Buck had limited educational credentials in the toxicology field and he did not have a toxicology degree, we conclude the trial court misapplied the law for the qualifications of an expert under N.D.R.Ev. 702. *See Kluck*, 1997 ND 41, ¶ 10, 561 N.W.2d 263; *Aune*, 478 N.W.2d at 563–64; *Oberlander*, 460 N.W.2d at 402.

[¶ 15] The trial court's conclusion that Dr. Buck's testimony would be speculative and theoretical because he did not know the amount of epoxy primer Fencil sprayed into the building ignores the factual dispute about how much epoxy primer Fencil sprayed into the building and the use of hypothetical questions about that issue. Hypothetical questions asking for an expert opinion must be based upon "facts previously stated by the witness or upon facts testified to by others or upon facts agreed to or assumed to be true hypothetically." *Jore v. Saturday Night Club Inc.*, 227 N.W.2d 889, 896 (N.D.1975); *see generally Modern Status of Rules Regarding Use of Hypothetical Questions in Eliciting Opinion of Expert Witness*, 56 A.L.R.3d 300, ¶ 6 (2003); *see also Fluckey v. Chicago & Northwestern Trans. Co.*, 838 F.2d 302, 303 (1988) ("A hypothetical question 'should include only

such facts as are supported by the evidence' "). In addition, an expert opinion can be based on hearsay or facts not in evidence as long as those facts are of a type reasonably relied on by experts in the particular field in forming opinions. *See* Rule 703, N.D.R.Ev. Under Rule 705 of the North Dakota Rules of Evidence an expert can even state his opinion without first disclosing the underlying facts or data, unless the court requires otherwise. *See Feuerherm v. Ertelt,* 286 N.W.2d 509, 512 (N.D.1979). Although Fencil claims he sprayed for about five minutes on each of the two occasions and only sprayed about two and one half gallons of primer each time he sprayed, there was evidence that Fencil sprayed for a "good half hour" before Langness asked him to stop and Fencil had switched to a second fifty-five gallon barrel of epoxy primer during the process. There was also evidence Fencil's sprayer was capable of spraying at least three gallons per minute. The disputed factual issues about the actual amount of epoxy primer sprayed in the building were issues for an appropriate hypothetical question. To the extent the trial court concluded that Dr. Buck's proffered testimony was speculative or theoretical, we conclude the trial court misapplied the law regarding the use of expert testimony and hypothetical questions.

[¶ 16] Dr. Buck was prepared to testify about the concentrations of toxic materials released by Fencil under hypothetical questions within the range of evidence presented at trial. Although Dr. Buck did not have a toxicology degree and may not have been qualified to offer a medical opinion about the effect of the epoxy primer on Langness, his proffered testimony could have assisted the jury in understanding the dispersion of toxic materials in the building and in deciding whether Fencil was negligent. Under these circumstances, the trial court misapplied the law in excluding Dr. Buck's proffered testimony and we therefore conclude the court abused its discretion in excluding his testimony.[1]

[¶ 17] Under N.D.R.Ev. 103(a), error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected. Here, Langness offered testimony from his pulmonologist, Dr. Blair Anderson, who diagnosed Langness with RADS from the September 11 exposure. Although the trial court permitted Langness to call Fencil's retained toxicologist, Aaron Rash, Rash did not testify that Langness was exposed to toxic chemicals during the spraying episodes. Dr. Buck's proffered testimony that Langness was exposed to toxic chemicals during the spraying episodes was critical to Langness' claim that Fencil was negligent in his application of the epoxy primer. Under these circumstances, we conclude Langness' substantial rights were affected by the exclusion of Dr. Buck's proffered testimony. We therefore reverse the judgment and remand for further proceedings consistent with this opinion. Because we reverse and remand for further proceedings, we briefly address other issues raised by Langness which are likely to arise again on remand. *See Principal Residential Mortgage, Inc. v. Nash,* 2000 ND 21, ¶ 18, 606 N.W.2d 120.

### III

[¶ 18] Langness argues the trial court erred in admitting evidence about his set-

---

1. The parties have not argued we should adopt the standards for admitting expert testimony articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and we need not consider that issue.

tlements with the other defendants and in instructing the jury on this issue.

[¶ 19] Langness initially sued Polydyne for strict liability in tort and negligence, and Fencil, RDO, and an RDO employee for negligence. Before trial, Langness settled with all the defendants except Fencil. In opening instructions to the jury, the trial court said:

> The Defendant has denied that it was negligent and contends that any injuries that have come about for the Plaintiff are as a result of his own negligence, or the negligence of other entities. Defendant also contends damages could have been lessened or avoided by things the plaintiff could have done.
>
> In the early stages of this litigation there were other defendants who the Plaintiff contended may be liable for damages, including the owner of the building being constructed and the manufacturer of the particular product being sprayed on the building. Claims against others have since been resolved, and your deliberations will only need to focus on whether or not the remaining Defendant has any liability in the case.
>
> . . . .
>
> The law requires that fault be apportioned among those parties or other persons you might find to be at fault in causing the Plaintiff's damages.
>
> When you are asked to return a verdict in this case, you will be asked to make special findings of fact determining: 1. Who was at fault, if anyone; 2. Whether such fault was a proximate cause of damages; 3. The respective percentages of fault allocated to the Defendant, the Plaintiff, or others who you might determine were at fault and contributed to proximately cause any damages suffered by the Plaintiff.
>
> You should not concern yourselves with the reasons there may have been settlements with other defendants who were once a part of the lawsuit, and should not draw any conclusions from the fact of settlements, or the fact that Fencil Urethane Systems, Inc., is the only remaining Defendant in the lawsuit.

[¶ 20] At trial, the court sustained Langness' objection to Fencil's attempted introduction into evidence of the summons and complaint, but allowed Langness to review the complaint and permitted Fencil to question him about allegations regarding the liability of other parties. Although the court allowed Fencil to briefly ask Langness about claims of liability against other entities, the court eventually precluded Fencil from "going through different paragraphs" in the complaint.

[¶ 21] In *Thomas v. Stickland*, 500 N.W.2d 598, 600–01 (N.D.1993), this Court held a trial court erred in admitting into evidence the fact of a settlement between the plaintiff and a third-person tortfeasor. We concluded, however, in view of other evidence about the circumstances of an accident, there was no possibility of prejudice to the plaintiff and the error was harmless. *Id.* at 601. In *Stickland*, at 600, we said exclusion of settlement evidence is the norm and admission of settlement evidence is the exception. Rule 408, N.D.R.Ev., provides for the exclusion of evidence of settlement to prove liability, nonliability, or the amount of a claim, but does allow settlement evidence for other purposes, such as proving bias or prejudice of a witness. *See Stickland*, at 600. Whether to allow evidence for another purpose is within the discretion of the trial court, and a trial court may allow the introduction of evidence there was a settlement to explain the absence of a former party to a lawsuit. *Id.* at 600–01.

[¶ 22] Here, the court instructed the jury about the absence of the other

parties because of settlements and told the jury not to draw any conclusions from those settlements. Langness has cited no evidence to indicate the jury was in any other way informed that he had settled with RDO, Polydyne, or the RDO employee. A party has the right to present evidence to a jury about the fault of other parties and nonparties, and a trial court must instruct the jury to allocate fault between the parties and nonparties. *See Barnes v. Mitzel Builders, Inc.*, 526 N.W.2d 244, 247 (N.D.1995) (quoting N.D.C.C. § 32–03.2–02). Langness has cited no evidence to demonstrate Fencil presented evidence of a settlement between Langness and the other defendants to the jury. Rather, Fencil presented evidence that there had been other named defendants in this action who Langness blamed for his injuries. Although trial courts must be cautious with evidence and instructions about settlements with other entities, we have examined the evidence and instructions cited by Langness and we conclude the trial court did not abuse its discretion on this issue.

## IV

[¶ 23] Langness argues the trial court erred in allowing Fencil to impeach him on a collateral matter. On cross-examination of Langness, the following colloquy occurred:

Q. [MR. BAKKE:] I have some questions for you also. First of all, is this your first lawsuit that you have been involved in?

MR. HAGEN: I object. I don't know what relevance it has.

MR. BAKKE: Goes to bias and credibility.

THE COURT: Okay. Overruled.

THE WITNESS: In what type of lawsuit?

Q. (MR. BAKKE CONTINUING) In any type of lawsuit?

THE COURT: Well, let's be more specific, Counsel.

Q. (MR. BAKKE CONTINUING) Any civil lawsuit?

A. Yes, I had one in, maybe, '68, '70, '69.

Q. Okay. Is that the one involving The Bowler?

A. Yes.

Q. In Fargo?

A. Yes.

Q. And you sued someone?

A. Yes.

Q. You sued The Bowler?

A. Yes, I did.

Q. As a result of an altercation that occurred?

A. That is correct.

Q. Okay. And is that the only civil lawsuit you have been involved in?

A. Yes, it is.

Q. And that's what you testified to in your deposition, is that correct?

A. Yes.

Q. And you stick with that answer?

A. Yes, I do.

Q. And you understand when you gave that deposition testimony you were under oath to tell the truth?

A. Yes.

Q. You've lived in Cass County for quite sometime, is that correct?

A. Since 1957.

Q. Do you remember a lawsuit you were involved in, a civil lawsuit, by The Foreign Publishing Company versus Duane Langness?

A. No, I don't.

MR. HAGEN: Your Honor, I object. We're on some pretty remote collateral matters. He's trying to pick some-

thing out 20, 30 years ago and then trying to make a liar out of him. Clearly, it's improper.

MR. BAKKE: Your Honor, this is impeachment.

THE COURT: I guess he said he didn't recall. I'm going to let you proceed a little bit further. We're talking about something that's how old here?

MR. BAKKE: 1990, Your Honor.

THE COURT: Okay. For now, the objection is overruled. Proceed.

Thereafter, Fencil's counsel asked Langness about his involvement in several other lawsuits.

[¶ 24] Langness argues his involvement in unrelated litigation was irrelevant and could not be brought up on cross-examination under N.D.R.Ev. 608(b). Fencil responds Langness did not object on the grounds of improper character evidence or past conduct under N.D.R.Ev. 608(b) and is precluded from raising that argument on appeal.

▆▆▆ [¶ 25] Evidence sought to be introduced through cross-examination must be relevant to be admissible. *Williams County Soc. Servs. Bd. v. Falcon*, 367 N.W.2d 170, 178 (N.D.1985). The scope of cross-examination for impeachment purposes is within the trial court's discretion. *Id.* In *State v. Tucker*, 58 N.D. 82, 224 N.W. 878, 887 (1929), this Court recognized a witness may not be questioned about wholly irrelevant matters merely for the purpose of contradicting those matters with other extrinsic evidence, and if irrelevant questions are asked and answered, the answer cannot be contradicted by the cross-examiner:

> Witnesses may often be questioned, on cross-examination, as to matters collateral to the issue for the purpose of testing their credibility. But it is a well-settled rule that witnesses cannot be interrogated as to matters wholly irrelevant, merely for the purpose of contradicting them by other evidence. Hence, if irrelevant questions are asked and answered, the answer cannot be contradicted by the cross-examiner. If a party inquires of a witness as to immaterial matters, he must take the answer, and cannot raise an issue thereon by introducing evidence to contradict it.

*See also* N.D.R.Ev. 403, 608(b). Because we remand for further proceedings, we need not decide whether Langness has properly preserved this issue for review, or whether the court abused its discretion in allowing this line of questioning. On remand, however, Fencil must establish that questions about prior lawsuits are relevant and tied to matters at issue in this lawsuit.

### V

▆▆▆ [¶ 26] Langness argues the trial court erred in excluding from evidence a technical data sheet for epoxy primer. At trial, Langness offered into evidence two technical data sheets about epoxy primer. One technical data sheet was prepared in 1997, and the court admitted that exhibit into evidence. The other technical data sheet was effective in June 1987, and the court excluded that exhibit as irrelevant and confusing, or potentially confusing to the jury. A trial court has broad discretion in deciding whether proffered evidence is relevant, and the court's decision to admit or to exclude evidence on the ground of relevance will not be reversed absent an abuse of discretion. *Wolf v. Estate of Seright*, 1997 ND 240, ¶ 14, 573 N.W.2d 161. We conclude the trial court did not abuse its discretion in excluding the older technical data sheet.

## VI

[¶ 27] Langness contends the trial court abused its discretion in excluding the testimony of therapist Geralyn Heitkamp, who had conducted a functional capacity evaluation which Langness claims established his breathing ability was below normal. Langness also argues the trial court erred in refusing to grant a continuance.

[¶ 28] Heitkamp performed the functional capacities evaluation on June 13, 2002. The trial court granted Fencil's motion to exclude the testimony of Heitkamp, including the functional capacities evaluation conducted by her:

At the time of hearing on July 16, 2002, the Court announced its conclusion that the disclosure and proposed testimony of Geralyn M. Heitkamp, within a month of the trial date should not be permitted. Ms. Heitkamp is an occupation therapist who performed a functional capacities evaluation on the plaintiff on June 13, 2002. Given the fact that the defendant would be unable to counter this evidence, which has been disclosed at this late date, warrants the GRANT of the motion in limine to exclude Ms. Heitkamp's testimony or evaluation report.

[¶ 29] This record includes a scheduling order with a July 15, 2001 deadline for Langness to disclose all experts, and Langness' October 24, 2001 witness list, which did not disclose Heitkamp. In a supplemental answer to interrogatories on June 28, 2002, Langness identified Heitkamp as an expert. The trial began on July 22, 2002. Although the trial court could have granted a continuance for Fencil to counter this evidence, *see Reimche v. Reimche*, 1997 ND 138, ¶ 9, 566 N.W.2d 790, we need not decide if the court abused its discretion in excluding Heitkamp's testimony and evaluation because an issue regarding the timing of the disclosure is not likely to arise on remand. *See DeCo-*

*teau v. Nodak Mut. Ins. Co.*, 2000 ND 3, ¶ 26 n. 2, 603 N.W.2d 906.

## VII

[¶ 30] Langness argues the trial court erred in refusing to give requested jury instructions on reckless endangerment, *see* N.D.C.C. § 12.1–17–03; menacing, *see* N.D.C.C. § 12.1–17–05; disorderly conduct, *see* N.D.C.C. § 12.1–31–01(g) and (h); and methyl ethyl ketone, *see* N.D.C.C. § 12.1–31–06(18) and N.D.C.C. § 19–03.1–22.1.

[¶ 31] Jury instructions must correctly and adequately inform the jury of the applicable law and must not mislead or confuse the jury. *Rittenour v. Gibson*, 2003 ND 14, ¶ 15, 656 N.W.2d 691. We review jury instructions as a whole to determine their correctness. *Id.* Instructions will be allowed if, as a whole, they advise a jury of the law on essential issues in the case. *Id.* The trial court is not required to instruct the jury in the exact language sought by a party if the court's instructions adequately and correctly inform the jury of the applicable law. *Western Nat'l Mut. Ins. Co. v. University of North Dakota*, 2002 ND 63, ¶ 42, 643 N.W.2d 4.

[¶ 32] Here, the instructions requested by Langness pertained to criminal liability. The trial court instructed the jury on negligence. The court also instructed the jury on a strict liability in tort and duty to warn because there was evidence presented by a representative from Polydyne about its warnings for the epoxy primer. The trial court's instructions correctly and adequately advised the jury on the law of negligence, and we conclude the court did not err in refusing to give Langness' requested instructions.

## VIII

[¶ 33] Langness claims the trial court erred in taxing costs. Because we

reverse and remand for a new trial, this issue may not arise on remand and it is not necessary to address it. *See DeCoteau,* 2000 ND 3, ¶ 26 n. 2, 603 N.W.2d 906.

## IX

[¶ 34] Langness argues the trial court erred in refusing to amend his complaint to include a claim for punitive damages and in refusing to submit punitive damages to the jury.

[¶ 35] A trial court's denial of a motion to amend pleadings will not be reversed on appeal absent an abuse of discretion. *Hartman v. Estate of Miller,* 2003 ND 24, ¶ 9, 656 N.W.2d 676. The trial court did not abuse its discretion in denying Langness' motion to amend his pleadings, and he has presented only a brief conclusory argument for submitting the issue of punitive damages to the jury. We decline to further consider these issues.

## X

[¶ 36] Because Fencil included materials in its supplemental appendix which were not in the record on appeal, we award double costs on appeal. *See* N.D.R.App.P. 10, 13, 30; *Estate of Wieland,* 1998 ND 130, ¶ 22 n. 3, 581 N.W.2d 140.

## XI

[¶ 37] We reverse the judgment and remand for proceedings consistent with this opinion.

[¶ 38]GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.