1997 ND 69

Joseph D. MOCH, Personal Representative of the Estate of Joseph J. Moch, a/k/a J.J. Moch, deceased, Plaintiff and Appellant,

v.

Patrick D. MOCH, Lillian M. Moch, Defendants and Appellees,

and

United States of America acting through the Farmers Home Administration, United States Department of Agriculture, Defendant.

Civil Nos. 960178, 960179.

Supreme Court of North Dakota.

April 22, 1997.

James R. Jungroth (argued), of Mackenzie & Reisnour, Jamestown, for plaintiff and appellant.

Albert A. Wolf (argued), of Wheeler Wolf, Bismarck, and Kent Morrow (appearance), of Severin, Ringsak & Morrow, Bismarck, for defendants and appellees.

NEUMANN, Justice.

[¶ 1] Joseph D. Moch, Personal Representative of the estate of Joseph J. Moch, a.k.a. J.J. Moch, deceased (the Estate), appealed from judgments entered in Emmons and Kidder counties. The judgments dismissed the Estate's actions against Patrick D. Moch and Lillian Moch, husband and wife, to cancel and foreclose contracts for deed, and dismissed counterclaims presented by Patrick and Lillian.[1] We affirm in part, reverse in part, and remand for further proceedings.

[¶ 2] In 1977, Patrick and Lillian purchased from J.J. Moch, Patrick's father, land in Emmons and Kidder counties on contracts for deed. The total purchase price of the two parcels of land was $308,000, with down payments of $90,280, leaving a total balance of $217,720 to be paid in twenty annual payments of $17,469.85 due the first day of each December, from 1978 through 1997. Patrick and Lillian made payments to J.J. in varying amounts at varying times each year.

[¶ 3] On February 9, 1993, J.J. had a will drawn that left his estate to four sons, other than Patrick, in equal shares. J.J. died on February 16, 1993. The Estate sued to cancel and foreclose the contracts for deed, alleging Patrick and Lillian were in default in the payments required. Patrick and Lillian answered and counterclaimed, alleging they were not in default and were entitled to a credit of $92,370 for hay used by J.J.

[¶ 4] The trial court found: (1) In 1972–1974, Patrick provided 154 ten-ton stacks of hay worth $46,200 to J.J. for J.J.'s cattle; (2) The 1977 contracts obligated Patrick to annual payments of $17,469.85 for twenty years; (3) In 1978, J.J. "orally agreed to accommodate the hay debt by accepting a $5,000 reduced annual payment on the land contracts;" and (4) J.J. opined that "Patrick was behind in his land payments," but "took no action to enforce his contractual remedies." The court further found:

"Regardless of the alternative findings, the total due on the contracts during their lifetime (20 years) was $349,397. The attached ledger sheet shows payments of $303,966.37. To this amount is added the hay credit of $46,200, for a total payment made of $350,166.37.

"Therefore, the Court finds that the required payments have been made (actually an overpayment of $769.37) and the estate is obligated to convey, by a warranty deed, the described property to the defendants. Further, these actions are ordered dismissed. The counterclaim is not granted inasmuch as it asks for a credit of $92,370 and other compensation, which amount has not been awarded by the Court."

Judgments were entered accordingly, and the Estate appealed.

[¶ 5] The Estate contends the trial court's finding that the parties orally altered the contracts for deed to allow a credit for hay Patrick provided to J.J. of $46,200, payable by crediting $5,000 per year on the payments due, is clearly erroneous.

[¶ 6] Lance Moch, one of J.J.'s sons, testified that Patrick made hay for J.J.'s cattle in 1972–1974. Greg Moch, Patrick's son, testified: (1) He and Patrick took off about 109 stacks of hay in 1972, 89 in 1973, and 110 in 1974; (2) They fed 400–500 head of cattle over the winters in 1972–1974; (3) All of the cattle were J.J.'s; (4) The three-year total for the hay was $92,000. Alex Moch, Patrick's cousin, testified: (1) He helped Patrick haul hay in 1973 and 1974; (2) "[T]hey were ten-plus-ton stacks;" (3) He didn't remember how many stacks they hauled, but they "hauled a lot of them;" and (4) Prairie hay sold for about $30 per ton at the time.

[¶ 7] Patrick testified: (1) in 1972–1974, J.J. had about 170 acres of hayland, which produced eight to ten stacks of hay per year;

1. The Estate also sued the United States of America, acting through the Farmers Home Administration, United States Department of Agriculture. The United States consented to entry of judgment providing for a judicial sale of the land and a one-year period of redemption.

(2) Patrick was feeding 500 head of cattle owned by J.J. in 1972–1974; (3) It takes about 4,915 pounds of hay to feed a cow over winter; (4) In 1972, J.J. bought from him 109 stacks of hay—he "figured ten-ton stack, but they weighed 12 to 14–ton;" (5) There were 89 stacks in 1973 and 110 in 1974; (6) He had no livestock then and fed the hay only to J.J.'s cattle; (7) J.J. didn't buy any other hay; (8) He and J.J. agreed to $30 per ton, which was the average rate at that time; (9) The total was $92,760; (10) In 1972, 1973, and 1974, Lance "[c]alled me a dummy for selling my hay to J.J.;" (11) In some years he paid J.J. more than the contracts for deed required because J.J. said he needed money; and (12) J.J. never confronted him about being behind in his payments.

[¶ 8] Thus, there was evidence from which the trial court could have found Patrick sold to J.J. as many as 308 ten-ton stacks of hay worth $92,400 in 1972–1974. The trial court's finding that Patrick provided 154 ten-ton stacks of hay worth $46,200 to J.J. for J.J.'s cattle, is not clearly erroneous.

[¶ 9] Patrick testified: (1) Whenever he asked J.J. about payment for the hay, J.J. said he did not have the money; and (2) At Thanksgiving dinner in 1978, J.J. said, "I'll take 5,000 from the hay bill and apply it on the land payment each year."

[¶ 10] Lillian Moch, Patrick's wife, testified: (1) On Thanksgiving Day in 1978, "[w]e were sitting around the table having coffee after—after the meal;" (2) Patrick "asked his dad if we could have a $10,000 payment on [the hay debt];" and (3) J.J. said, "I'll let you take $5,000 off each year until its paid for."

[¶ 11] Greg Moch, Patrick's son, testified: (1) On Thanksgiving Day in 1978, Patrick asked J.J. for "a $10,000 payment against the hay bill;" (2) J.J. asked, "Would it be agreeable to a $5,000 credit off the land payment?;" and (3) "And then that was an option that was jointly accepted."

[¶ 12] Raymond Finck, a friend of J.J.'s, testified: (1) He was at Patrick's on Thanksgiving Day in 1978; (2) J.J. and Patrick had a conversation "about this hay deal;" and (3) He "heard J.J. mention the figure, 5,000." Guy Moch, Patrick's son, testified that, on Thanksgiving Day in 1978, "I remember them talking about the hay deal and I remember—a $5,000 figure sticks in my head."

[¶ 13] Byron West testified: (1) In 1982, he and his wife "went over to purchase some land from [J.J.] . . . and he told me that he was taking $5,000 a year off of Pat's payment for the hay that he purchased from Pat;" (2) He saw J.J. two or three times a week; and (3) J.J. never mentioned Patrick and Lillian being behind in their payments on the land contracts.

[¶ 14] Thus, there is substantial evidence supporting the trial court's finding that, in 1978, J.J. "orally agreed to accommodate the hay debt by accepting a $5,000 reduced annual payment on the land contracts." [2]

[¶ 15] The trial court found the total due on the contracts was $349,397, and that $350,166.37 (with the hay credit of $46,200) had been paid, resulting in an overpayment of $769.37. The Estate contends the court's calculation is clearly erroneous. We agree.

[¶ 16] The total purchase price of the land under the two contracts for deed was $308,000. Patrick and Lillian made a down payment of $90,280, leaving a balance of $217,720, plus interest, to be paid in twenty annual installments of $17,469.85. Thus, the total amount to be paid over the twenty-year life of the contracts, after payment of the down payments, was $349,397 (20 × $17,469.85). In calculating what Patrick and Lillian had paid toward the $349,397 due under the contracts, the trial court credited them with the payments they made over the years, gave them the hay credit of $46,200, and credited them $90,280 for the down payment. The $349,397 due under the contracts, however, was in addition to the down payment of

---

2. The Estate noted in its brief that a 1990 letter from Patrick's attorney to J.J.'s attorney "discusses the debt on the farm land and at no time makes any reference to a $5,000.00 credit." Lillian testified that the letter, which deals with ownership of a herd of cattle, "[e]ntirely deals with cattle care." Patrick testified that he had not told his attorney about the $5,000 per year hay credit.

$90,280 Patrick and Lillian paid at the time of the purchase. By including $90,280 in the amount paid toward the $349,397 due over the twenty-year life of the contracts for deed, the trial court gave Patrick and Lillian a double credit for the down payment. The trial court's finding of the amount paid is, therefore, clearly erroneous.

[¶ 17] The Estate contends the trial court erred in determining the contracts for deed contained no acceleration clauses. The Estate argues: "A cancellation alone is an acceleration but the added phrase, 'time is of the essence of this agreement' is an acceleration clause."

[¶ 18] The contracts for deed do not contain specific acceleration clauses. The contracts do provide:

"But should default be made in the payment of said several sums of money ... or in any of the covenants herein to be kept and performed by the Buyers, then this agreement, at the election of the Seller, or his successors or assigns, time being of the essence of this agreement, may be canceled or foreclosed ..., and in case of such cancellation or foreclosure of this agreement, the Buyers hereby agree upon demand of the Seller or his successors or assigns, quietly and peacefully to surrender to him possession of said premises and property."

However, the trial court reasonably found from the evidence that "Patrick made reduced payments of varying amounts and J.J. did not declare the contracts to be in default" and "took no action to enforce his contractual rememdies in the event of default."

[¶ 19] "Cancellation of a contract for deed by action is an action in equity." *Adolph Rub Trust v. Rub*, 474 N.W.2d 73, 75 (1991), *cert. denied*, 503 U.S. 911, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1992). When a seller cancels a contract for deed by action, the matter of a redemption period is left to the trial court's sound discretion. *Id.* at 76. "[T]he trial court is required to base its decision on equitable principles." *Shervold v. Schmidt*, 359 N.W.2d 361, 363 (N.D.1984). The trial court could reasonably conclude that J.J. waived strict compliance with the contracts:

"It is well established that a vendor may waive, as to default on any installment, the provision of the contract making time the essence of the agreement.... The doctrine of estoppel may apply where late payments are accepted by the vendor more than once without objection, such conduct being inconsistent with the time-is-the-essence clause."

*Shervold*, 359 N.W.2d at 363. In *Shervold*, the contract did not contain an acceleration clause, and time no longer was the essence of the contract because the seller's acceptance of late payments was inconsistent with the terms of the contract. This court concluded "the trial court acted within the scope of its equitable discretion by allowing Lawrence Schmidt to make payments to bring the contract current, thus reinstating the contract for deed." 359 N.W.2d at 364.

[¶ 20] The judgments are affirmed insofar as they award Patrick and Lillian a hay credit of $46,200 at $5,000 per year against the payments due on the contracts for deed. The judgments are reversed to the extent they twice credit the $90,280 down payment made by Patrick and Lillian. The matter is remanded for recalculation of the amounts paid and due and the interest, if any, due on overdue payments, and for exercise of the trial court's discretion to reinstate the contracts by allowing Patrick and Lillian to bring the contracts current, or by setting an equitable period of redemption.

[¶ 21] VANDE WALLE, C.J., and MARING, MESCHKE and SANDSTROM, JJ., concur.