2015 ND 39

**STERLING DEVELOPMENT GROUP THREE, LLC, Sterling Development Group Eight, LLC, Plaintiffs and Appellants**

v.

**James D. CARLSON, Defendant and Appellee.**

No. 20140188.

Supreme Court of North Dakota.

Feb. 12, 2015.

Nancy J. Morris (argued), Jason T. Loos (on brief) and Erik R. Johnson (on brief), Fargo, N.D., for plaintiffs and appellants.

Charles K. Maier (argued), Loren L. Hansen (appeared) and Kermit J. Nash (on brief), Minneapolis, MN, for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Sterling Development Group Three, LLC, and Sterling Development Group Eight, LLC, appeal from a judgment dismissing their action against James D. Carlson to collect on two personal guarantees and from an order awarding Carlson costs and disbursements. Because the district court's finding that the principal's contractual obligations were altered without Carlson's knowledge or consent is not clearly erroneous, and the court did not abuse its discretion in awarding costs and disbursements, we affirm the judgment and order.

I

[¶ 2] In 1983, Carlson founded PRACS Institute, Ltd., a medical research facility which began operating in East Grand Forks, Minnesota. In 1999, Sterling Development Group Three entered into a 15–year lease agreement with PRACS for a building located in East Grand Forks. Carlson signed the lease agreement as the president of PRACS. Carlson also signed a personal guaranty, which provided in relevant part:

SECTION 1. Statement of Guaranty. Guarantor guarantees a payment of rent under the attached lease pursuant to the terms thereof. If Obligor defaults in the payment of any installment of rent, Guarantor shall pay the amount of such installment within thirty (30) days after receipt of notice of default and demand for payment. Guarantor's liability hereunder shall not be affected by reason of any extension of time for payment of any installment granted by Obligee to Obligor.

[¶ 3] When PRACS expanded in 2004, Sterling Development Group Eight built an expansion to the Sterling Three building, and PRACS entered into a lease agreement with Sterling Eight for a term running simultaneously with the Sterling Three lease. Carlson signed a similar personal guaranty for the Sterling Eight lease. In January 2006, Carlson sold PRACS to Contract Research Solutions, Inc., which the parties refer to as Cetero. The Sterling companies consented to this "change of control." Carlson's daily involvement in PRACS ceased at that point. Carlson received Cetero stock in the sale and became a member of Cetero's seven-member board of directors.

[¶ 4] In 2010, Cetero suspended its East Grand Forks operations, but continued to pay rent to the Sterling companies. In the spring of 2012, Cetero filed for bankruptcy. The bankruptcy trustee eventually rejected the East Grand Forks Cetero leases with the Sterling companies and stopped paying rent. The Sterling companies then brought this action against Carlson to collect more than $600,000 for unpaid rent under his personal guarantees.

[¶ 5] Following a bench trial, the district court dismissed the action. The court found Carlson was exonerated from liability under the personal guarantees because the original lease agreements had been altered in three respects by the Sterling companies and Cetero or PRACS without Carlson's knowledge or consent. First, the court found the Sterling companies and Cetero altered the contractual responsibility for providing janitorial services. Second, the court found the Sterling companies and PRACS altered PRACS' con-

tractual obligation to pay real estate taxes so the Sterling companies could receive certain amounts of tax increment financing benefits. Third, the court found that the Sterling companies and Cetero altered the contractual method for calculating base rent adjustments for the leases. The court, after reviewing the Sterling companies' objections, awarded Carlson $7,069.30 for costs and disbursements.

## II

[¶ 6] The Sterling companies argue the district court erred in finding the original lease agreements were contractually altered without Carlson's knowledge or consent, resulting in exoneration of his personal guaranty obligations.

[¶ 7] In *Ag Servs. of America, Inc. v. Midwest Inv. Ltd. P'ship*, 1998 ND 189, ¶ 10, 585 N.W.2d 571, this Court explained when an alteration may exonerate a guarantor's obligations:

Section 22–01–15, N.D.C.C., provides:

A guarantor is exonerated, except insofar as he may be indemnified by the principal, if, by any act of the creditor without the consent of the guarantor:

1. The original obligation of the principal is altered in any respect; or

2. The remedies or rights of the creditor against the principal in respect thereto are impaired or suspended in any manner.

Alteration of a contract "is a process wherein the parties make '[a] change in the provisions of a contract.' Black's Law Dictionary 71 (5th ed.1979)." *Biteler's Tower Serv., Inc. v. Guderian*, 466 N.W.2d 141, 143 (N.D.1991). As this Court has observed, the materiality of an alteration of a principal's obligation is irrelevant; under N.D.C.C. § 22–01–15, a guarantor is exonerated if the creditor alters the principal's original obligation

"in any respect" without the guarantor's consent. *Tri–Continental Leasing Corp. v. Gunter*, 472 N.W.2d [437,] 439 [ (N.D.1991) ]. To be exonerated, a guarantor need not be injured by an alteration in the principal's obligation. *AMF, Inc. v. Fredericks*, 212 N.W.2d 834, 836 (N.D.1973).

Whether there has been an alteration of an original agreement is a finding of fact subject to the clearly erroneous standard of review. *See RRMC Constr., Inc. v. Barth*, 2010 ND 60, ¶ 7, 780 N.W.2d 656; *Moch v. Moch*, 1997 ND 69, ¶¶ 5–8, 562 N.W.2d 558; *Estate of Murphy*, 554 N.W.2d 432, 437 (N.D.1996); *Mandan Sec. Bank v. Heinsohn*, 320 N.W.2d 494, 500 (N.D. 1982), *overruled on other grounds, First Interstate Bank v. Larson*, 475 N.W.2d 538 (N.D.1991). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, we are left with a definite and firm conviction a mistake has been made. *See, e.g., Chornuk v. Nelson*, 2014 ND 238, ¶ 10, 857 N.W.2d 587.

[¶ 8] The district court found "[b]oth the Sterling Three and Sterling Eight leases required Sterling to provide the janitorial service in the PRACS leased spaces and PRACS would be billed for said services by reconciliation of the common area maintenance (CAM) payment to Sterling.... In June 2008, Cetero and Sterling Three and Sterling Eight agreed that Cetero could provide the janitorial services. This, then, would ... change the CAM payment to Sterling. This agreement altered the original lease agreements." The Sterling companies argue the court erred because there was no contractual alteration of the lease terms regarding janitorial services.

[¶ 9] The lease agreement between Sterling Three and PRACS provided in relevant part:

2.1.2 Additional payment for common area maintenance. Lessee covenants and agrees to pay to Lessor a pro rata share of Lessee's expenses for common area maintenance incurred during each operating year of this Lease (CAM payment). Lessee's share shall be based on a ratio of the actual leased space divided by the total building square footage. These expenses include, but are not limited to real estate taxes and special assessments, parking lot repairs and maintenance, property management fees, snow removal, grounds maintenance, common area cleaning and janitorial services, sprinkling and alarm, repair, maintenance of building and fixtures (other than structural repairs which are Lessor's obligation, as stated in 3.1.1, below), repair and maintenance, water, electricity, utilities, garbage, property and liability insurance. Property management fees shall be seven percent (7%) of the annual base rent. Also included in the CAM payment are the utilities (including gas and electricity) attributable to the Lessee's demised premises in addition to the utilities attributable to the common area.

2.1.3 Lessees shall pay to Lessor an advance payment on the CAM payment in the amount of $4.00 per actual square foot of leased space (including the pro-rata share of the common area attributable to Lessee), per annum, paid in equal monthly installments. Said amount represents an estimate of the annual expenses to be incurred by the Lessor as additional rent under paragraph 2.1.2 above. The Lessor shall account to the Lessee annually for the actual additional rent by conducting an annual accounting of the expenses (including the utilities attributable to the Lessee's demised premises) on or before March 1 of each calendar year during the term hereof. Lessor's business records supporting the annual accounting shall be available to Lessee for inspection. If the additional rent is increased as a result of expenses paid by the Lessor, Lessor shall bill Lessee for the additional expenses at the time of delivering said accounting to Lessee, which shall be due within thirty (30) days thereof. If the amount collected for additional rent exceeds the amount due Lessor for additional rent, the Lessor shall refund said overpayment to Lessee within the same thirty-day period. Lessor may adjust the estimated annual CAM payment from year to year based on the prior years' expenses and anticipated future expenses by written notice to Lessee.

[¶ 10] Sections 2.1.2 and 2.1.3 of the lease agreement between Sterling Eight and PRACS are substantively identical in relevant part to these provisions except they refer to a "Maintenance" payment rather than a "CAM" payment and tie the "advance payment" to the amount called for under the Sterling Three lease. Section 3.2.2 in both leases provides: "Lessee services and expenses. Lessee shall be responsible for payment of, and shall be responsible for all cleaning for, the demised premises."

[¶ 11] The evidence establishes that under this contractual arrangement, the

Sterling companies arranged for janitors to perform janitorial services in the PRACS leased space. The Sterling companies would initially pay for the services and it would be adjusted through annual CAM reconciliation letters which invoiced the future estimated CAM payment that included a payment for general janitorial expenses. This could result in either a bill or a credit for the tenant. The annual letters included a line item for "Janitorial-common areas" and a line item for "Janitorial-direct expense to tenant" listing the applicable charges owed by PRACS.

[¶ 12] In June 2008, Cetero's director of finance sent an email to the Sterling companies about the cleaning services:

> We are exploring some different ways in our group to increase efficiencies, and are wondering if we are allowed in our contract to hire janitorial staff as employees rather than contract with an outside service. I know we currently pay for services in CAM's as a pass through, and we are exploring whether we can just pay for the services directly and have personnel on staff instead of having the CAM pass through. We have not made any decisions on anything—we are merely exploring options and know that we would have to ensure we complied with our lease agreement, which is why I am checking.

The Sterling companies responded:

> I have talked to Kevin Bartram, the owner of the PRACS property in EGF, and he said that it would be fine if you would like to hire your own janitorial services. Please let us know if and when this change would take place so that we can notify the current janitorial service and adjust the CAM prices. The only portion of janitorial that you will still be billed for in CAM will be for a portion of the common areas.

By November 2008, PRACS had taken over the responsibility for arranging and paying for janitorial services, and the annual letters from the Sterling companies began listing nothing owed for "Janitorial-direct expense to tenant."

[¶ 13] The Sterling companies argue the district court erred in finding an alteration of the leases because the tenant under section 3.2.2 of the leases was always "responsible for cleaning the demised space, and for payment of the service." This argument ignores sections 2.1.2 and 2.1.3 of the leases, which placed the obligation on the Sterling companies to arrange and provide for "common area cleaning and janitorial services," and the conduct of the contracting parties which adhered to this practice. The general rules governing contract interpretation apply to the interpretation of leases. *See Tank v. Citation Oil & Gas Corp.*, 2014 ND 123, ¶ 9, 848 N.W.2d 691. The purpose of contract interpretation is to find the "mutual intention of the parties as it existed at the time of contracting." N.D.C.C. § 9-07-03. Even if section 3.2.2 of the leases creates an ambiguity, "[a] course of dealings and usage should be given effect in interpreting a contract ambiguity." *Mandan Educ. Ass'n v. Mandan Pub. Sch. Dist. No. 1*, 2000 ND 92, ¶ 9, 610 N.W.2d 64; *see also* N.D.C.C. § 9-07-20. The Sterling companies had always arranged for and provided janitorial services in the leased PRACS space, and PRACS was ultimately responsible for payment of the costs. The Sterling companies and Cetero agreed to change this practice. The district court's finding that this change altered the contractual obligations of the parties is not clearly erroneous.

[¶ 14] Although the Sterling companies argue "Carlson actually or impliedly consented" to the alterations in the leases, the

district court found "Carlson had no actual knowledge of the change in janitorial services in 2008" and he had "no implied knowledge of any of the altered changes to the original leases" because the Sterling companies "failed to prove by the preponderance of the evidence that Carlson was present at any meeting of the board where these alterations were approved by an affirmative vote of a majority of the board present." The court's finding is supported by Carlson's testimony and is not clearly erroneous.

[¶ 15] Because we conclude the district court's finding that PRACS' and Cetero's contractual obligations regarding janitorial services were altered without Carlson's knowledge or consent is not clearly erroneous, it is unnecessary to address the other two alterations found by the court. We conclude the court correctly ruled Carlson was exonerated of his obligations under the guarantees.

### III

[¶ 16] The Sterling companies argue the district court erred in awarding Carlson $7,069.30 in costs and disbursements, because the costs were in excess of that provided by law.

[¶ 17] An award of costs under N.D.C.C. § 28–26–10 is discretionary, and a district court's decision on an award of disbursements under N.D.C.C. § 28–26–06 will be reversed only if the court abused its discretion. *See Johnson v. Bronson,* 2013 ND 78, ¶ 28, 830 N.W.2d 595; *Holkesvig v. Welte,* 2011 ND 161, ¶ 12, 801 N.W.2d 712. A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a reasoned determination, or it misinterprets or misapplies the law. *See Sorum v. Dalrymple,* 2014 ND 233, ¶ 8, 857 N.W.2d 96.

[¶ 18] The Sterling companies argue the district court erred in allowing deposition costs for Carlson and another witness. Under N.D.C.C. § 28–26–06(2), the court "shall tax" in favor of the prevailing party the "necessary expenses of taking depositions and of procuring evidence necessarily used or obtained for use on the trial." The Sterling companies rely on *Estate of Dittus,* 497 N.W.2d 415, 421 (N.D.1993), in which this Court held the district court did not abuse its discretion in denying travel expenses for attending a deposition as the deponent. Here Carlson sought no travel expenses, but only the costs of obtaining the deposition transcripts. The court did not abuse its discretion in awarding these costs.

[¶ 19] The Sterling companies argue the district court erred in taxing the expenses of converting documents "to database ready images." The court determined these were expenses of procuring evidence obtained for use at trial under N.D.C.C. § 28–26–06(2), and allowed them. The court did not abuse its discretion.

[¶ 20] The Sterling companies argue the district court erred in allowing Carlson's expenses incurred in obtaining a trial transcript for purposes of preparing his closing trial brief. Under N.D.C.C. § 28–26–06(4), disbursements are allowed for the "legal fees of the court reporter for a transcript of the testimony when such transcript is used ... in preparing a statement of the case." We agree with the court that "this language is broad enough to allow taxing the expense of a transcript used for preparing the party's closing brief." The court did not abuse its discretion.

[¶ 21] The Sterling companies argue the district court erred in allowing Carlson fees for an expert witness on damages who did not testify, because: (1) the parties agreed to bifurcate the trial between liabil-

ity and damages; (2) the witness was not qualified to testify as an expert; and (3) the expert's opinion was biased. First, this Court has ruled N.D.C.C. § 28–26–06(5) does not "require[ ] that an expert witness actually testify before the trial court may include her fee in a party's costs and disbursements." *Pratt v. Heartview Found.,* 512 N.W.2d 675, 679 (N.D.1994). Second, the court found the witness was qualified to testify as an expert under N.D.R.Ev. 702, which "envisions generous allowance of the use of expert testimony if the witness is shown to have some degree of expertise in the field in which the witness is to testify." *In re J.M.,* 2013 ND 11, ¶ 11, 826 N.W.2d 315. Third, the court reasoned "any bias of the expert does not go to admissibility of his testimony, but rather would go to its weight." *See, e.g., Kluck v. Kluck,* 1997 ND 41, ¶ 12, 561 N.W.2d 263. The court did not abuse its discretion.

[¶ 22] We conclude the district court did not abuse its discretion in its award of costs and disbursements.

IV

[¶ 23] We do not address other arguments raised because they either are unnecessary to the decision or are without merit. The judgment and order are affirmed.

[¶ 24] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, LISA FAIR McEVERS, and CAROL RONNING KAPSNER, JJ., concur.