2015 ND 189

The CITY OF MOORHEAD, a political subdivision of the State of Minnesota, Plaintiff and Appellee

v.

BRIDGE COMPANY, Defendant and Appellant

and

The City of Fargo, a political subdivision of the State of North Dakota, Defendant and Appellee.

No. 20140431.

Supreme Court of North Dakota.

July 30, 2015.

Andrew D. Cook (argued) and Michael D. Nelson (on brief), West Fargo, N.D., for plaintiff and appellee.

Bruce A. Schoenwald (argued), Randolph E. Stefanson (on brief), and Steven K. Aakre (on brief), Moorhead, MN, for defendant and appellant.

Ronald H. McLean (argued) and Peter W. Zuger (on brief), Fargo, N.D., for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Bridge Company appeals from a judgment ordering it to donate a toll bridge to the cities of Fargo, North Dakota, and Moorhead, Minnesota, free and clear of all liens. Because the district court did not err in interpreting the parties' agreement and the court's findings of fact are not clearly erroneous, we affirm.

I

[¶ 2] In May 1986, the cities and the Company entered into an agreement for the purpose of construction and operation of a private toll bridge over the Red River connecting 12th Avenue North in Fargo with 15th Avenue North in Moorhead. Section 2.3 of the agreement provided "[a]ny and all financing necessary for the construction, operation, and maintenance of the bridge is the responsibility of the Company." Section 4.2 of the agreement provided "[t]he bridge shall be owned and operated by the Company and costs of constructing the bridge shall be paid by the Company." Section 5.3 of the agreement provided "[t]he bridge shall be maintained and repaired at the sole cost and expense of the Company in a state of good repair in accordance with the generally accepted standards by the Highway Departments for the States of North Dakota and Minnesota for similar structures." The agreement allowed the Company to charge a toll for vehicular traffic on the bridge.

[¶ 3] The agreement further provided:

6.1. *Term. The term of this Agreement shall be for a period of [25] years* commencing with the day the Bridge commences operations. *At the expiration of 25 years* from the day the Bridge commences operations one of the following shall occur:

a) *In the event the original debt incurred* for the construction of the Bridge, including any refinancing or renegotiation of such debt, and any debt incurred for major maintenance and repairs to the Bridge, *have been fully paid, the Company shall donate the Bridge to the Cities free and clear* from any liens, and the Cities shall accept the Bridge for public use to be operated by the Cities as they may determine. It is expressly understood and agreed by and between the parties that any refinancing or additional financing which constitutes a lien or encumbrance on the Bridge which may be obtained more than five years after the original financing for the construction of the Bridge, shall be subject to the approval of the Cities. The amortization of any refinancing may not extend beyond 25 years from the commencement of the operation of the Bridge and the Company agrees it will not default on any loan secured by the Bridge. It is further agreed the Company will not permit or cause to be filed any lien or encumbrance on the Bridge other than a first lien for permanent financing and such liens or encumbrances as are necessary to secure interim construction financing.

b) *In the event any portion of the original debt* incurred for the construction of the Bridge, including any refinancing or renegotiation of such debt approved in advance by the Cities, or any portion of any debt incurred for major maintenance and repairs of the Bridge *remains unpaid, the Cities shall have the option to either:*

1. *To pay or assume such outstanding indebtedness* and, in such

event, the Company shall convey the Bridge to the Cities; or

2. *Grant the Company the right to continue to operate the Bridge* under the terms of this Agreement *for an additional term of five (5) years, and upon the expiration of such extended term the Company shall donate the Bridge to the Cities free and clear* from any liens and the Cities shall accept the Bridge for public use to be operated by the Cities as they may determine.

. . . .

6.4. *Suspension of Obligations to Perform. The Company's obligation to construct, maintain, and operate the bridge shall be suspended for reasons beyond the reasonable control of the Company,* or by reason or [sic] acts of God, or force majeure, strikes, lock outs, labor troubles, or unavailability of building materials *and the time for performance shall be extended for a period equal to the delays so caused.*

. . . .

7.9. *Remedies.* Upon the occurrence and continuance of an event of default of which the defaulting party has notice, the other party or parties shall have the right to enforce its rights by commencing judicial proceedings to:

. . . .

b) enforce the terms of this Agreement or to seek injunctive relief, including a temporary restraining order, preliminary injunction, and specific performance without showing or approving any actual damage sustained and shall not thereby be deemed to have elected its remedies[.]

(Emphasis added.)

[¶ 4] The bridge was completed and started operations on June 1, 1988. The bridge was originally financed with public-ly-sponsored bonds issued by Moorhead and capital from an investment firm. In 2004, the cities agreed to allow the Company to refinance the indebtedness, but the refinancing was required to be completely amortized by June 1, 2013, which was 25 years from the commencement of the operation of the bridge. The bank refinancing the debt required personal guarantees from the Company's two shareholders.

[¶ 5] On May 29, 2013, Moorhead brought this declaratory judgment and specific performance action against the Company and Fargo seeking to have the Company either donate the bridge to the cities under section 6.1(a) of the agreement or allow the cities to take over operation of the bridge if any qualifying debt remained under section 6.1(b)(1). The Company responded that Fargo had already approved a five-year extension under section 6.1(b)(2) of the agreement and Moorhead had waived the early termination option under section 6.1(b)(1).

[¶ 6] As of June 1, 2013, the Company owed approximately $75,000 on the refinanced loan. In early September 2013, the Company's two shareholders satisfied their personal guarantees for the debt, and as of September 6, 2013, none of the original indebtedness for construction of the bridge remained outstanding. During the 25–year time span, the Company's records reflected $108,761 was paid for maintenance and repair of the bridge. All of these bills were paid by the Company before February 6, 2014. However, taxes remained owing to Cass County, North Dakota, and Clay County, Minnesota, and the unpaid taxes constituted a lien on the bridge.

[¶ 7] A bench trial was held on August 12, 2014. The district court found that during the 25–year period between June 1, 1988, and June 1, 2013, the bridge was closed 249 days because of flooding on the

Red River. Applying the Acts of God clause in section 6.4 of the agreement, the court ruled the 25–year period was extended 249 days to February 5, 2014, and because there was no qualifying debt in existence as of that date, the Company was required to donate the bridge to the cities free and clear of any liens.

[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The Company's appeal is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

[¶ 9] The Company argues the district court erred in construing the parties' agreement and it is entitled to operate the toll bridge for an additional five years because the cities failed to exercise their option to pay the outstanding indebtedness on June 1, 2013.

[¶ 10] In *The Pifer Group, Inc. v. Liebelt*, 2015 ND 150, ¶ 16, 864 N.W.2d 759, we explained:

"The construction of a written contract to determine its legal effect is a question of law, which is fully reviewable on appeal. *Brash v. Gulleson*, 2013 ND 156, ¶ 15, 835 N.W.2d 798. " "[O]n appeal, we independently examine and construe the contract to determine if the trial court erred in its contract interpretation." " *Id.* (quoting *Bakken v. Duchscher*, 2013 ND 33, ¶ 13, 827 N.W.2d 17). We construe contracts to give effect to the parties' mutual intent at the time the contract was formed. N.D.C.C. § 9–07–03; ... When possible, we look at the language of the contract alone to determine the parties' intent. N.D.C.C. § 9–07–04; ... We give words their plain, ordinary, and commonly understood meaning, unless contrary intention plainly appears. N.D.C.C. § 9–07–09; ... We read the contract as a whole and give effect to each provision. N.D.C.C. § 9–07–06; ..."

(quoting *Northstar Founders, LLC v. Hayden Capital USA, LLC*, 2014 ND 200, ¶ 45, 855 N.W.2d 614).

[¶ 11] We do not reverse a district court's findings of fact unless they are clearly erroneous under N.D.R.Civ.P. 52(a)(6). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, we are left with a definite and firm conviction a mistake has been made. *Sterling Dev. Grp. Three, LLC v. Carlson*, 2015 ND 39, ¶ 7, 859 N.W.2d 414.

[¶ 12] The Company argues the district court's error in this case stems from its failure to recognize the "fundamental nature" of the agreement. According to the Company, the agreement merely defined the terms of a franchise from the cities for the construction and operation of a toll bridge. Because a franchise is defined as a "right" or a "privilege," 36 Am. Jur. 2d *Franchises from Public Entities* §§ 1, 3 (2011), and under section 3.1 of the agreement the cities granted the Company "the right to construct, operate and maintain a toll bridge," the Company argues it "was never actually 'obligated' to build or operate the bridge." Therefore, according to the Company, because the Acts of God clause in section 6.4 of the agreement applies only to its "obligation[s]," section 6.4 cannot apply as a matter of law.

[¶ 13] Although the Company's argument cannot be faulted for its creativity, it is fundamentally unsound. Even if the agreement created a franchise, a franchise is a contract subject to the general rules of contract interpretation. *See Capi-*

*tal Elec. Coop., Inc. v. City of Bismarck,* 2007 ND 128, ¶¶ 15–16, 736 N.W.2d 788. Under those rules, we read contracts as a whole and give effect to each provision. *Liebelt,* 2015 ND 150, ¶ 16, 864 N.W.2d 759. Describing the agreement as a "franchise" does not eliminate the numerous obligations imposed on the Company throughout the agreement. While the Company was given "the right to construct, operate and maintain a toll bridge," the plain language of the agreement imposed an obligation upon the Company to do so as well.

[¶ 14] The Company argues the district court erred in relying on the Acts of God clause in section 6.4 to extend the time for the cities to exercise the options outlined in section 6.1(b), because section 6.4 refers only to the "Company's obligation to construct, maintain, and operate the bridge." According to the Company, even if its obligations to perform were extended for 249 days to February 5, 2014, the cities were still required to exercise one of the two options listed under section 6.1(b) by June 1, 2013.

[¶ 15] Section 6.1 of the agreement sets forth a 25–year term for the agreement, thereby assuring the Company a full 25 years to operate the bridge. At the end of the 25–year period, the agreement provided for either donation of the bridge to the cities or options for the cities to pursue depending on whether any original debt or debt incurred for major maintenance and repairs remained unpaid by the Company. Section 6.4 requires the Company's obligations be "suspended" by Acts of God and "the time for performance shall be extended for a period equal to the delays so caused." Section 6.1 is prefaced with reference to the 25–year term which must expire before either sections 6.1(a) or 6.1(b) take effect. Requiring the cities to perform by exercising an option before the 25–year term the Company was given to perform its obligations expired is an illogical and unreasonable interpretation of the agreement.

[¶ 16] The Company also argues the Acts of God clause is contained in section 7.8 of the agreement, which addresses "Events of Default" and provides that if "by reason of Acts of God [or] force majeure . . . the Company or Cities are unable to perform their obligations under their Agreement they shall not be deemed in default during the continuance of such inability." Reliance on this provision is puzzling because the cities have not claimed the Company was in default of its obligations during the 249 days Red River flooding prevented operation of the bridge, and the default provision applies only "during the continuance of such inability." The Company also argues section 6.4 does not apply because it references only obligations to "construct, maintain, and operate the bridge" rather than obligations to service debt. Under this agreement, the obligation to construct, maintain, and operate the bridge certainly includes an obligation to pay for construction, maintenance, and operation of the bridge.

[¶ 17] The district court's finding that the bridge was closed 249 days because of flooding is not clearly erroneous, and the court did not err in concluding section 6.4 operated to extend the term of the agreement to February 5, 2014. The court's findings that the original indebtedness for construction costs and $108,761 in bills for maintenance and repair of the bridge had been paid before February 6, 2014, are also not clearly erroneous. Consequently, the court correctly determined that section 6.1(a) of the agreement governed and "[s]ection 6.1(b) never applied so the cities did not have to choose."

[¶ 18] We conclude the district court did not err in interpreting the parties'

agreement and in ordering the Company to donate the toll bridge to the cities free and clear of all liens.

## III

[¶ 19] The Company argues the district court erred in failing to order the cities to reimburse it for the $108,761 spent for maintaining and repairing the bridge under section 6.1(b) of the agreement.

[¶ 20] First, section 6.1(b) addresses debt incurred only for "major maintenance and repairs," and the district court's finding that "[t]hese expenses do not qualify as 'major' maintenance and repairs" is not clearly erroneous. Second, section 6.1(b) does not apply in this case. Third, and most important, the Company does not direct our attention to any provision of the agreement requiring the cities to reimburse it for maintenance and repair expenses previously paid by the Company. The Company's argument is without merit.

## IV

[¶ 21] The Company argues it should be awarded "approximately $10,000" in mediation expenses from Moorhead because the city breached a mediation agreement. This claim was not pled as a counterclaim and the district court, understandably, did not address the issue. "A fleeting reference in a brief to an unpled claim is insufficient to properly raise an issue for consideration." *Arndt v. Maki*, 2012 ND 55, ¶ 14, 813 N.W.2d 564. We do not address this issue.

## V

[¶ 22] It is unnecessary to address other arguments raised, because they either are unnecessary to the decision or are without merit. The judgment is affirmed.

[¶ 23] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, LISA FAIR McEVERS and CAROL RONNING KAPSNER, JJ., concur.